## *In re* CHAE CHAN PING.

*(Circuit Court, N. D. California.* October 15, 1888.)

1. CHINESE—EXCLUSION ACT OF 1888—CONSTRUCTION.
   The Chinese exclusion act, approved October 1, 1888, took effect from its passage, and it applies to all Chinese laborers who had departed from the United States, and had not in fact returned and arrived in the United States before the passage of the act.

2. SAME—CONSTITUTIONAL LAW—EX POST FACTO LAW.
   The Chinese exclusion act of October 1, 1888, is a valid act. It is not unconstitutional as being a law divesting rights fully vested under the several treaties between the United States and China, and the prior restriction acts of 1882 and 1884, to which it is supplemental, or as being an *ex post facto* law

3. SAME—OBLIGATION OF CONTRACTS—CERTIFICATES UNDER ACT OF 1882.
   Certificates issued under the restriction acts of 1882 and 1884 are not contracts between the United States and the Chinese laborers, to whom they are respectively issued. They are issued as evidence to identify parties entitled to privileges provided for in our treaties with China, and acts passed to give them effect.

4. SAME—TREATIES—ACTS OF CONGRESS—REPEAL.
   With respect to matters proper for congressional legislation, treaties and acts of congress stand upon an equal footing as parts of the supreme law of the land, and a later inconsistent provision in either repeals the earlier in the other.

*(Syllabus by the Court.)*

Petition for Writ of *Habeas Corpus.*

The petitioner is a Chinese laborer, a subject of the empire of China. He resided in the state of California, and followed the occupation of laborer, at San Francisco, Cal., from 1875 until June 2, 1887. On the last-named day he departed from San Francisco for China, on the steamship Gaelic, having in his possession the certificate duly issued to him by the collector of customs of the port of San Francisco, in pursuance of the provisions of section 4 of the restriction act of 1882, as amended by the act of 1884. He sailed from Hong Kong, China, on his return to California, on the steam-ship Belgic, on September 7, 1888, and arrived at the port of San Francisco on October 7, 1888. On October 1, 1888, he was on the high seas, *en route* for California; and until his arrival at the port of San Francisco, at the date aforesaid, he had no notice, or means of knowledge, of the passage by congress of the exclusion act, which became a law on October 1, 1888. On his arrival at San Francisco, he presented to the customs officers his certificate so duly issued to him, as aforesaid, on his departure, under section 4 of the restriction act, as amended in 1884, and demanded permission to land. The collector refused to permit him to land, solely on the ground that, under the act of congress approved October 1, 1888, supplemental to the restriction acts of 1882 and 1884, the certificate was annulled and made void, and his right to land abrogated, and that the petitioner was thereby forbidden to again enter the United States. Upon these facts appearing in the petition the writ of *habeas corpus* was issued, and the petitioner produced in obedience to its commands.

*T. D. Riordan, Lyman I. Mowrey,* and *A. H. Ricketts,* for petitioner.
*J. T. Carey,* U. S. Atty., *contra.*

Before Sawyer, Circuit Judge, and Hoffman, District Judge.

Sawyer, J., (*after stating the facts as above.*)  The first question arising on the facts stated, is, is the petitioner embraced within the provisions of the act of congress approved October 1, 1888, forbidding the coming of Chinese laborers into the United States?  Upon this point, it seems to us, there can be no doubt.  The language of section 1 of the act, so far as it affects the petitioner, is, "that, from and after the passage of this act, it shall be unlawful for any Chinese laborer, who shall at any time heretofore have been  *  *  *  a resident within the United States, and who shall have departed  *  *  *  therefrom, and shall not have returned before the passage of this act,  *  *  *  to return to  *  *  * the United States."  And of section 2, "that no certificate of identification provided for in the fourth and fifth sections of the acts to which this is supplemental shall hereafter be issued, and every certificate heretofore issued in pursuance thereof is hereby declared void and of no effect, and the Chinese laborer, claiming admission by virtue thereof, shall not be permitted to enter the United States."  This language is clear and exact, and is susceptible of but one construction.  The act, in express and unmistakable terms, fixes the date from which it shall begin to operate, and that date is "from and after the passage of this act; that is to say, October 1, 1888, when it became a law.  In equally clear and explicit terms it provides upon whom it shall operate, and that is "any Chinese laborer, who shall at any time heretofore have been  *  *  * a resident within the United States, and shall have departed,  *  *  * and shall not have returned before the passage of this act,"—not every Chinese laborer who shall have departed and not yet have started on his return, but every Chinese laborer who shall have departed, and shall not in fact "have returned before the passage of this act."  There is no possible ground under this specific language of inferring an exception in favor of those who were on the high seas at the date of the passage of the act.  The act, by express provision, operates upon all within its terms from the moment it was approved by the president and became a law.  Now, the petitioner had been a resident within the United States, and he had departed therefrom with his certificate duly issued in pursuance of section 4 of the prior restriction act, as amended, and he had not returned "before the passage of this act."  He did not in fact return till several days after its passage.  There cannot be any doubt that the act operates upon him, and, this being so, under section 1 it is unlawful for him to return to the United States, and by section 2 his certificate is declared to be "void, and of no effect," and it is provided that he "shall not be permitted to enter the United States."  To admit him, therefore, would be to directly violate the unmistakable provisions of the statute.  But it is said, it would be a great hardship, and a violation of the faith of the nation to, now, shut out those who were already on the way, relying upon the treaties and law as they were when they left China upon

their return voyage without any means of notice of the change until their arrival. Be it so. That is no concern of the courts, acting judicially, except so far as it bears upon the construction of an ambiguous statute. The responsibility of this hardship is not upon the courts. They do not and cannot make the law. That was a consideraion to be addressed to congress and the president. It is the duty of the courts to administer, and enforce the law as they find it. Hardship affords no justification, or authority, for the courts to take out of the provisions of the statute by forced construction, matters that congress clearly, and, unmistakably, intended should not be excepted. That congress intended no such exceptions is not only apparent from the clear and unambiguous language used, but from its own action during the course of the passage of the bill through congress, and by the subsequent action of both the executive and congress. One of the grounds of a motion to reconsider in the senate before final action on the bill, was, that, there might be an opportunity to provide an exception of this very class of cases, but that body refused to reconsider for that purpose. So the president, in his message accompanying his approval, noticed the comprehensive terms of the act, and suggested the immediate passage of another act, or joint resolution making this very exception; but congress declined to act upon the suggestion. It is evident, therefore, both from the language of the act, and the action of the president and congress, that no such exception was intended. It would be a gross assumption of authority for the court to now ingraft the exception, so repudiated, upon the act.

It is next urged with great zeal by petitioner's counsel that if the petitioner is within the scope of the act, then the act is unconstitutional, and void—*First*, as divesting a right indefeasibly vested under the treaties and laws passed in pursuance thereof; *secondly*, as being an *ex post facto* law within the clause of the constitution providing that congress shall have no power to pass *ex post facto* laws. The certificate, it is urged, is a contract entered into between the United States and the petitioner in pursuance of the restriction act, which vests him with a right that cannot now be divested under the general principles of public justice, even though the constitutional provision against passing laws impairing the obligation of contracts is in terms only restrictive upon the states. We think this is not the correct view. There is no contract between the United States and individual Chinese laborers at all. The Chinese laborers obtain no rights under the acts of congress beyond what is secured to them by the treaties. There is no consideration moving from them, individually or collectively, under the act of congress, upon which a contract was founded. All the rights they have are derivative, merely, resting upon the stipulations of the treaty between the two governments, which are the contracting, and only contracting parties. Instead of enlarging their rights, the acts of congress are restrictive in character, and the restrictions were adopted in pursuance of the agreement allowing such restriction in the last treaty. The certificates are mere instruments of evidence, issued to afford convenient proof of the identity of the party entitled to enjoy the privileges secured by the treaties, and to

prevent frauds, and they are so designated in the last act. The act, in fact, restricted the evidence upon which their rights and privileges could be established. Before the passage of the restriction acts Chinese laborers could be admitted on any evidence competent under the ordinary rules of evidence; now, by the act of 1884, they are limited to the particular certificate prescribed. It was not a contract in any proper sense, but only an instrument of evidence to establish the identity of the party already entitled to certain privileges under the compact, not between them and the United States, but between the two contracting governments. There was no mutual consideration, or discussion of the terms of a contract between the United States and Chinese laborers, who were affected by the restriction acts. There was no meeting of two minds on the terms of an agreement. The Chinese laborers were not consulted at all in the matter. The restriction acts, and certificates provided for therein, are, simply, sovereign commands and prohibitions, to which the Chinese laborers affected were compelled to submit, willing or unwilling. To call these acts and certificates provided in pursuance thereof a contract would be an abuse of language. As between the two governments treaties are laws, and they confer rights and privileges as long as they are in force, and, doubtless. Some rights accrue and become indefeasibly vested by covenants or stipulations that have ceased to be executory and have become fully executed, as in the case of title to property acquired thereunder. But we do not regard the privilege of going and coming from one country to another as of this class of rights. The being here with a right of remaining is one thing, but voluntarily going away with a right at the time to return is quite another. The right of congress to legislate in such manner as to control and repeal stipulations of treaties granting this latter class of rights was clearly recognized in *Ah Lung's Case*, 9 Sawy 308, 18 Fed. Rep. 28, decided by Mr. Justice FIELD, and concurred in by myself. Says the court:

"A treaty is in its nature a contract between two nations, and by writers on law is generally so treated, and not as having of itself the force of a legislative act. The constitution of the United States, however, places both treaties and laws made in pursuance thereof in the same category, and declares them to be the supreme law of the land. It does not give to either a paramount authority over the other. So far as a treaty operates by its own force, without legislation, it is to be regarded by the courts as equivalent to the legislative act, but nothing further. If the subject to which it relates be one upon which congress can also act, that body may modify its provisions, or supersede them entirely. The immigration of foreigners to the United States, and the conditions upon which they shall be permitted to remain are appropriate subjects of legislation, as well as of treaty stipulation. No treaty can deprive congress of its power in that respect. As said by Mr. Justice CURTIS, in the case of *Taylor* v. *Morton*. 'Inasmuch as treaties must continue to operate as part of our municipal law, and be obeyed by the people, applied by the judiciary and executed by the president, while they continue unrepealed; and inasmuch as the power of repealing these municipal laws must reside somewhere, and nobody other than congress possesses it, then legislative power is applicable to such laws whenever they relate to subjects which the constitution has placed under that legislative power.' 2 Curt. 459. An act of congress then, upon

a subject within its legislative power, is as binding upon the courts as the treaty on the same subject. Both are binding except as the later one conflicts or interferes with the former. If the nation with whom we have made the treaty objects to the action of the legislative department, it may present its complaint to the executive department, and take such other measures as it may deem that justice to its own citizens or subjects require. The courts cannot heed such complaint, nor refuse to give effect to a law of congress, however much it may seem to conflict with the stipulations of the treaty. Whether a treaty has been violated by our legislation so as to be the proper occasion of complaint by the foreign government is not a judicial question To the courts it is simply a case of conflicting laws, the last modifying or superseding the earlier."

This same principle was stated by me again, in *Ah Ping's Case*, 11 Sawy. 20, 21, 23 Fed. Rep. 329. In the *Head Money Cases*, 112 U. S. 598, 5 Sup. Ct. Rep. 247, the supreme court cites the case of *Ah Lung*, *supra*, upon the point stated in the passage quoted, and approves the doctrine stated, adding:

"It is very difficult to understand how any different doctrine can be sustained. A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If this fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this the judicial courts have nothing to do, and can give no redress. But a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law, and which are capable of enforcement as between private parties in the courts of the country. An illustration of this character is found in treaties which regulate the mutual rights of citizens and subjects of the contracting nations in regard to rights of property by descent or inheritance, when the individuals concerned are aliens. The constitution of the United States places such provisions as these in the same category as other laws of congress, by its declaration that, 'this constitution, and the laws made in pursuance thereof, and all treaties made or which shall be made under authority of the United States, shall be the supreme law of the land.' A treaty, then, is a law of the land, as an act of congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute. But even in this aspect of the case there is nothing in this law which makes it irrepealable or unchangeable. The constitution gives it no superiority over an act of congress in this respect, which may be repealed or modified by an act of a later date. Nor is there anything in its essential character, or in the branches of the government, by which the treaty is made, which gives it this superior sanctity. * * * In short, we are of opinion that, so far as a treaty made by the United States with any foreign nation can become the subject of judicial cognizance in the courts of this country, it is subject to such acts as congress may pass for its enforcement, modification or repeal."

This doctrine was again repeated at the last term of the supreme court, with emphasis, in *Whitney* v. *Robertson*, 124 U. S. 193, 195, 8 Sup. Ct. Rep. 456. The court closes the decision with these conclusions:

"It follows, therefore, that when a law is clear in its provisions, its validity cannot be assailed in the courts for want of conformity to stipulations of a previous treaty not already executed. Considerations of that character belong to another department of the government. The duty of the courts is to construe and give effect to the latest expression of the sovereign will."

The *Cherokee Tobacco Case*, 11 Wall. 616, and *U. S.* v. *McBratney*, 104 U. S. 621, 622, establish the same doctrine. See, also, *U. S.* v. *Benzon*, 2 Cliff. 513, upon the question of vested rights. We are satisfied that, under the doctrine established by the cases cited, the act in question is valid in the respect stated in the first branch of the point under discussion.

In support of the proposition, that the act is an *ex post facto* law, and, therefore, unconstitutional, counsel for petitioner rely upon the cases of *Cummings* v. *Missouri*, 4 Wall. 277, and *Ex parte Garland*, Id. 333. We were familiar with those cases, but we have examined them carefully, and are of opinion that they do not touch this case. We do not find any element of an *ex post facto* law in the act now in question. There is nothing in the nature of an offense in a Chinaman's departing from the country, and his departure is not made an offense; and there is nothing in the nature of punishment or of a penalty imposed for the act of having departed from this country, in providing, in the interest of the people of the United States, under a change of public policy, that he shall not return. There is simply a repeal by congress of a prior law found in the stipulations of the treaty with China.

We have, heretofore, found it our duty, however unpleasant, at times, to maintain, fearlessly, and steadily, the rights of Chinese laborers under our treaties with China, and the acts of congress passed to carry them out. That we have been right in law, is established by the fact that our decisions have been affirmed by the supreme court of the United States on every point of law and construction of the act that has been raised, or discussed before us in the courts and taken to that tribunal for its consideration. *That we have been right in fact, as well as in law*, in the view we entertained of the intention of congress, as expressed in the several restriction acts, is abundantly evidenced by the fact that at every session since our construction of the acts passed was made public in *Ah Quan's Case*, 10 Sawy 223, 21 Fed. Rep. 182, more than four years ago, congress has persistently refused to pass any law which conflicted with the stipulations of our treaties with China until the act now under consideration was hastily passed, after the government had failed to secure the desired objects by further treaty stipulations without a violation of those already existing. As we faithfully enforced the laws, as we found them, when they were in favor of the Chinese laborers, we deem it, equally, our duty to enforce them in all their parts, now that they are unfavorable to them. In view of what has heretofore occurred with reference to the administration of our treaties and laws upon the subject under consideration, we deem it proper to express the hope, that, so long as we sit upon the judgment seat, we shall be endowed with sufficient courage and firmness to administer honestly, and faithfully, according

to its true import, any valid law that congress may, in its wisdom, see fit to enact upon this, or any other, subject. That is what the judicial department of this government is established for, and when it ceases to perform its whole duty fearlessly and persistently by reason of popular clamor, or other improper outside influences, it will have ceased to perform its proper functions, and failed to answer the purposes of its creation. It is not the function of the courts to abrogate an unsatisfactory law by arbitrarily refusing to enforce it. The only proper mode of getting rid of such a law, is, for congress to repeal or modify it. We entertain no doubt that the act in question is valid, and that the petitioner is expressly forbidden by its terms to enter the United States, and that it would be unlawful for him to do so. The result is that he is not unlawfully restrained of his liberty, and that he must be remanded; and it is so ordered.